## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **ANTHONY SCHWARTZ, individually and on behalf of all others similarly situated,** | **Civil Action No.** |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **v.** | |
| **EQUIFAX, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Anthony Schwartz ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Equifax, Inc. ("Equifax" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

### NATURE OF THE CASE

1.     This is a putative class action lawsuit against Defendant based on its failure to, *inter alia*, undertake appropriate, legally required steps to protect and ensure the maximum possible accuracy when creating consumer reports using the personal information in its possession, in violation of federal and state law. Equifax is a multinational corporation based in the U.S. that evaluates credit,

public record, and other consumer information, and assembles such information into consumer reports, or "credit reports."  On August 2, 2022, Equifax confirmed that due to a "glitch" in its technology systems, the company provided inaccurate credit scores to lenders about potentially millions of individuals who applied for credit from mid-March through early April (hereinafter "the Glitch").[1]  In doing so, Defendant failed to adhere to the requirements of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA").[2]

2.      Equifax is a consumer reporting agency as defined by the FRCA. Consumer reporting agencies, such as Defendant, assemble and evaluate credit, public record, and other consumer information into consumer reports or "credit reports."[3]

3.      The FCRA was enacted "to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."[4]  Among other things, the FCRA "require[s] that consumer reporting

---

[1] *See* Wall Street Journal, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Customers* (Aug. 2, 2022), *available at* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483 and attached hereto as **Exhibit 1**.

[2] As a result of Defendant's FCRA violations, Defendant has also violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., as described below.  *See infra*, Count III.

[3] *See* 15 U.S.C. § 1681a(d) (defining "consumer report"); *see also* 15 § U.S.C. 1681 (recognizing "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy").

[4] *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted).

agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, **accuracy**, relevancy, and proper utilization of such information[.]"  15 U.S.C. § 1681(b) (emphasis added).

4.     The Consumer Financial Protection Bureau ("CFPB") has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[5]

5.     Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA.  Equifax's maintenance, use, and furnishing of consumer reports is and was intended to affect Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax.

6.     The damages that Plaintiff and Class Members bear as a result of the

---

[5] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Permissible Purposes for Furnishing, Using, and Obtaining Consumer Reports*, 87 FR 41243, 41245 (Jul. 12, 2022), https://www.federalregister.gov/d/2022-14823/p-41 (quoting Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures*, 86 FR 62468, 62471 (Nov. 10, 2021), https://www.federalregister.gov/d/2021-24471/p-63).

Glitch cannot be rectified by merely updating the affected credit reports.  In addition, while credit reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same credit reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

7.    Defendant's actions or inactions that allowed for the Glitch also violate its duties and obligations as a credit reporting agency under the FCRA, as described in detail herein.  Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

8.    Further, though the Glitch was caused by a "coding issue" from an employee or agent of Defendant, Equifax continued to provide inaccurate credit scores and consumer reports when it knew or should have known that Plaintiff and Class Member's consumer reports and credit scores were inaccurate.  Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

9.    This action seeks to hold Defendant accountable for its conduct and seeks vindication and recompense on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

10.    For the foregoing reasons, Plaintiff brings this action individually and on behalf of all similarly situated persons in the United States who suffered damages as a result of Defendant's failure to comply with the FRCA.  Based on Defendant's unlawful conduct, Plaintiff seeks to recover FCRA statutory damages to the fullest extent allowable by law, as well as punitive damages, restitution, declaratory relief, and reasonable attorneys' fees and costs.

11.    In addition, Plaintiff also seeks injunctive relief requiring, *inter alia*, that Defendant: (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Glitch; (ii) identify and notify each U.S. citizen who was affected by the Glitch; (iii) provide a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes; (iv) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Glitch; (v) disgorge its gross revenue from transactions, including but not limited to the revenue derived from selling inaccurate consumer reports and credit scores to business clients and the earnings on such gross revenue; and (vi) discontinue its above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the causes of the Glitch.

12.    Plaintiff and Class Members have standing to sue as a result of

Equifax's violations of federal and state statutes, including the FCRA, as detailed herein.  Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Glitch, Plaintiff and Class Members have suffered actual injury have suffered, and will continue to suffer, economic damages and other injury and actual harm as described herein.

## THE PARTIES

13.    Plaintiff Anthony Schwartz ("Plaintiff") is a citizen of California, residing in Sacramento, California.  Plaintiff applied for a mortgage — specifically, a Federal Housing Administration ("FHA")-backed mortgage from the FHA Home Loan Program for First Time Homebuyers (the "FHA loan") in mid-March of 2022.  However, Plaintiff's loan application was subsequently denied.  In the letter he received regarding the denial, Plaintiff saw that his credit score, reportedly furnished by Equifax, was inaccurate by approximately 15 points.  Had Defendant reported Plaintiff's accurate credit score, his loan application would not have been denied.  Thus, the denial of Plaintiff's loan application is a direct result of Defendant's inaccurate credit score report.

14.    Defendant Equifax, Inc. ("Equifax" or "Defendant") is a Georgia corporation with its principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.  Equifax is one of the major credit reporting

agencies in the United States.  As a credit reporting agency, Equifax maintains

information related to the credit history of consumers and provides the information

to credit grantors who are considering a borrower's application for credit or who

have extended credit to the borrower.  Equifax is engaged in a number of credit-

related services, and supplied over 2.1 billion credit card files to lenders in 2021.[6]

15.     Plaintiff reserves the right to amend this Complaint to add different or

additional defendants, including without limitation any officer, director, employee,

supplier, or distributor of Defendant who has knowingly and willfully aided,

abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §

1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"),

because this case is a class action where the aggregate claims of all members of the

proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there

are over 100 members of the putative class, and Plaintiff, as well as most members

of the proposed class, is a citizen of a state different from Defendant.  Additionally,

this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this

case arises under the "laws[] … of the United States"—namely, the Fair Credit

---

[6] *See* Equifax Company Profile, *available at* http://www.equifax.com/about-equifax/company-profile (last visited Aug. 9, 2022).

Reporting Act, 15 U.S.C. § 1681, et seq.—and thus raises a federal question.

17.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Georgia, regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia. Defendant intentionally avails itself of this jurisdiction by conducting its corporate operations in Georgia.

18.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because Equifax is headquartered in this District, it regularly transacts business in this District, and because a substantial part of the events, omissions, and acts giving rise to Plaintiff's claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A.     The Glitch Affected Millions Of Consumers

19.     On May 27, 2022, reporting first emerged that Equifax, one of the country's three largest consumer credit reporting agencies, had provided inaccurate credit scores on millions of U.S. consumers seeking loans during a three-week period in 2022.[7]

20.     According to public reporting in May of 2022, the Glitch occurred when Equifax experienced a "coding issue introduced during a technology change to its legacy online model platform may have resulted in the miscalculation of

---

[7] *See* National Mortgage Professional, *Equifax Telling Lenders of Potential Errors in Credit Scores* (May 27, 2022), *available at* https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores and attached hereto as **Exhibit 2**.

certain credit attributes for about 12% of credit scores."[8]

21.     According to reports from consumers and public reporting, Equifax sent the erroneous scores on people applying for auto loans, mortgages and credit cards to banks and nonbank lenders related to individuals applying for lines of credit.[9]

22.     The scores were sometimes off by 20 points or more in either direction, according to public reporting, "enough to alter the interest rates consumers were offered or to result in their applications being rejected altogether."[10]   Some scores were inaccurate by a much larger margin.[11]

23.     According to public reporting, "[t]he inaccurate scores were sent from mid-March through early April."   Despite the importance of accuracy in consumer credit reporting, Equifax only began disclosing the errors to lenders in May.[12]

24.     In a statement on May 27, 2022, Equifax officials acknowledged "there had been a coding issue within a program slated for replacement, and that it may have resulted in a potential miscalculation of certain attributes used in model calculations."[13]   Further, Equifax allegedly acknowledged in May 2022, to

---

[8] *Id.*

[9] *See id.*

[10] Ex. 1.

[11] *See, e.g.*, *id.* (noting that some applicants affected by the Equifax Glitch went from having a score in the 700s to no credit score at all).

[12] *Id.*

[13] Ex. 2.

resellers and lenders that for some transactions, certain attribute values — such as "number of inquiries within one month" or "age of oldest tradeline" — were potentially incorrect.[14]

25.    Despite that alleged private acknowledgment, Equifax publicly stated that credit reports were not affected.[15]  However, as discussed below, items included on credit reports, including the credit score itself, are vital aspects of a consumer report.

26.    In May of 2022, Defendant Equifax said data quality and accuracy are at the heart of everything Equifax does and it "take[s] this technology issue very seriously."[16]

27.    Mark Begor, Equifax's chief executive, publicly acknowledged the Glitch at a June investor conference, calling it a coding issue that affected "legacy applications that resulted in some scores going out that had incorrect data."[17]  He then said the company had fixed the problem and takes issues with its data quality seriously.[18]

## B.    Equifax Is Obligated To Ensure Maximum Possible Accuracy In Consumer Reports

---

[14] *Id.*

[15] *See* Equifax Newsroom, *Credit Scoring and the Equifax Coding Issue* (Aug. 4, 2022), https://www.equifax.com/newsroom/all-news/-/story/credit-scoring-and-the-equifax-coding-issue/.

[16] Ex. 2.

[17] Ex. 1.

[18] *Id.*

28.     Equifax is one of the major credit reporting agencies in the United States as defined in the FCRA.  *See* 15 U.S.C. § 1681a(f).

29.     As a credit reporting agency, Equifax generates and sells consumer reports or "credit reports" containing consumer information and details of a consumer's credit history to businesses and its recurring clients.

30.     Consumer reports are used by parties to determine whether and on what terms a consumer will be offered credit, including credit cards, student, car, and small business loans, mortgages, rental housing, and insurance.

31.     The FCRA defines consumer reports as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" in lending decisions.[19]

32.     As described by Equifax, "[b]usinesses – large and small – rely on us for consumer and business credit intelligence, credit portfolio management, fraud detection, decisioning technology, marketing tools, and human resources-related services.  We empower individual consumers to manage their personal credit

---

[19] 15 U.S.C. § 1681a, *et seq*.

information, protect their identity and maximize their financial well-being."[20]

33.     Prior to the Glitch, Equifax promised that it would deliver accurate information about consumers.  Equifax's privacy policy stated, in relevant part: "We have built our reputation on our commitment to deliver **reliable information to our customers** (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers."[21]

34.     Because of the importance of consumer report accuracy to businesses and consumers, the structure of the FCRA creates interrelated legal standards and requirements to support the policy goal of accurate credit reporting.[22]

35.     Among these is the requirement that, when preparing a consumer report, consumer reporting agencies "shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[23]  This includes maximum possible accuracy with respect to the information that is included on an individual's consumer report – including, but not limited to credit score itself.[24]

---

[20] Equifax Press Release, *Equifax Reports Strong Revenue and Earnings in First Quarter of 2007, Driven by Broad-based Growth Across All Operating Segments* (Apr. 23, 2007), https://investor.equifax.com/news-events/press-releases/detail/1140/equifax-reports-strong-revenue-and-earnings-in-first.

[21] http://www.equifax.com/privacy/ (last accessed Aug. 3, 2022).

[22] *See* Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures*, 86 FR 62468 (Nov. 10, 2021), https://www.federalregister.gov/d/2021-24471/p-63.

[23] 15 U.S.C. 1681e(b).

[24] Consumer Fin. Prot. Bur., Fair Credit Reporting: *Permissible Purposes for Furnishing and Using and Obtaining Consumer Reports*, 87 FR 41243 (Jul. 7, 2022), *available at* https://www.federalregister.gov/d/2022-14823/p-41.

36.     The Bureau has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[25]

37.     Further, the FCRA places strict obligations on credit reporting agencies, such as Equifax, when it comes to maintaining the accuracy of consumer credit reports. According to the CFPB, "[a]ccuracy in consumer reports is of vital importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers."[26]

38.     Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA.  Equifax's maintenance, use, and furnishing of consumer reports is and was intended to affect Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax.

## C.     Impact Of The Glitch

39.     Equifax acknowledges that, as a consumer reporting agency, it

---

[25] *Id.*

[26] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures*, 86 FR 62468, 62468 (Nov. 10, 2021).

"impact[s] some of life's most pivotal moments."[27]  Accordingly, the requirement of maximum possible accuracy in consumer reports "remains as important today as it was when the statute was enacted in 1970."[28]

40.    Indeed, according to the CFPB, "inaccurate information in consumer reports can have significant adverse impacts on consumers.  These impacts are particularly concerning for prospective renters and job seekers struggling to recover from the impacts of the COVID–19 pandemic."  The CFPB recently raised concerns that "[c]onsumers with inaccurate information in their consumer reports may, for example, be denied credit or housing they would have otherwise received, or may be offered less attractive terms than they would have been offered if their information had been accurate."[29]

41.    These concerns were realized for the millions of individuals, including Plaintiff and Class Members, who were denied credit or housing that they would have otherwise received, or were offered less attractive terms than Plaintiff and Class Members would have received had their information been accurate.

42.    Initially, it appeared as if the Glitch was limited to individuals who

---

[27] https://www.equifax.com/about-equifax/who-we-are/.

[28] Bureau of Consumer Fin. Prot., *Fair Credit Reporting; Name-Only Matching Procedures*, 86 FR 62468, 62469 (Nov. 10, 2021).

[29] *Id*. at 62468.

applied for mortgages, and the "company said that less than 9% experienced a change of 10 points or less; less than 3% experienced a change of 11 to 20 points; and less than 1% experienced a change of more than 20 points."[30]  However, further reporting in August revealed that the issue was not limited to individuals who applied for mortgages, and that the inaccurate consumer reports provided by Equifax "affected many lenders across multiple consumer loan products, not just mortgages, according to people familiar with the matter."[31]

43.    As reported by the Wall Street Journal in August of 2022,

> The percentage of incorrect scores provided to lenders varied, [people familiar with the matter] said.  At one big bank, for example, 18% of applicants during the three-week period had incorrect scores, with an average swing of 8 points.
> …
> Equifax told one large auto lender that about 10% of applicants during the three-week period had inaccurate scores, according to a person familiar with the matter.  Of those, several thousand saw a change of 25 points or more on their credit score, the person said.  In a small number of cases, applicants went from having no credit score at all to a score in the 700s—or vice versa, the person said.  The most widely used credit scores range between 300 to 850; the higher the credit score, the more likely an applicant will get approved and at a lower interest rate.[32]

44.    Nearly 25 million credit reports were requested from the three major

---

[30] Ex. 2.

[31] Ex. 1.

[32] *Id.*

credit reporting agencies during the Glitch and thus it is likely that hundreds of thousands, if not millions, of consumers were harmed by Equifax's actions and inactions.

45.     As a result of the inaccurate reporting of their consumer credit information, Plaintiff and Class Members have experienced, without limitation, the following injuries:

- loss of use of and access to financial accounts and/or credit;

- loss of money and time expended to avail themselves of assets and/or credit frozen or flagged due to inaccuracies;

- impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

- lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

- loss of money, including due to fees charged in some states, and time spent placing fraud alerts and security freezes on their credit records;

- costs and lost time obtaining credit reports to monitor their credit records to attempt to understand the reasoning behind the denials due to the Glitch;

- lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the Glitch, including but not limited

to efforts to research how to prevent, detect, contest, and recover from the Glitch;

- loss of the right and ability to control how their personal information is used; and

- continuing risks to their financial health, which remains subject to further harmful inaccurate reporting as long as Equifax fails to undertake appropriate, legally required steps to protect and ensure the maximum possible accuracy when creating consumer reports using the personal information in its possession.

46.     The damages that Plaintiff and Class Members bear as a result of the Glitch cannot be rectified by merely updating the affected credit reports.  In addition, while credit reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same credit reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

47.     Defendant's actions and/or inactions that allowed for the Glitch also constitute violation of its duties and obligations as a credit reporting agency under the FCRA, as described in detail herein.  Each instance in which Equifax has failed to comply with Sections 607 of the FCRA constitutes a separate violation of the

FCRA for the purpose of assessing monetary damages.

48.     Further, though the Glitch was caused by a "coding issue" due to an employee or agent of Defendant, Equifax continued to provide inaccurate credit scores and consumer reports when it knew or should have known that Plaintiff and Class Member's consumer reports and credit scores were inaccurate.  Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

49.     This action seeks to hold Defendant accountable for its conduct and seeks vindication and recompense on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

50.     Plaintiff seeks to recover FCRA statutory damages to the fullest extent allowable by law.  In addition, Plaintiff also seeks injunctive relief requiring, *inter alia*, that Defendant: (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Glitch; (ii) identify and notify each U.S. citizen who was affected by the Glitch; (iii) provide a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes; (iv) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Glitch; (v)

disgorge its gross revenue from transactions, including but not limited to the

revenue derived from selling inaccurate consumer reports and credit scores to

business clients and the earnings on such gross revenue; and (vi) discontinue its

above-described wrongful actions, inaction, omissions, want of ordinary care,

nondisclosures, and the causes of the Glitch.

51.     Plaintiff and Class Members have standing to sue as a result of

Equifax's violations of federal and state statutes, including the FCRA, as detailed

herein.  Further, because of Equifax's acts and/or omissions, willful disregard and

conduct, and want of ordinary care, and the resulting harm from the Glitch.

Plaintiff and Class Members have suffered actual injury have suffered (and will

continue to suffer) economic damages and other injury and actual harm as

described above.

## CLASS ALLEGATIONS

52.     Plaintiff seeks relief on behalf of herself and all others similarly

situated and brings all claims as class claims under Federal Rule of Civil Procedure

23(b)(1), (b)(2), (b)(3), and (c)(4).

53.     ***Class Definition***: Plaintiff brings this action individually and as a

class action on behalf of a class and subclass of similarly situated individuals

pursuant to Rule 23(a) of the Federal Rules of Civil Procedure.  The classes

Plaintiff seeks to represent are defined as follows:

(a)     ***Nationwide Class.***  All individuals and entities in the United States whose credit score or consumer report was inaccurately reported or inaccurately provided to potential lenders as a result of "the Glitch" reported by Equifax to have occurred place between at least March 6, 2022 through April 6, 2022 (the "Nationwide Class" or "Class").

(b)     ***California Subclass.***  All individual members of the Nationwide Class who resided in California during the events at issue in this complaint (the "California Subclass" or "Subclass").

54.     Specifically excluded from the Class and Subclass are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; Defendant's agents and employees; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

55.     Plaintiff reserves the right to amend the definition of the Class and Subclass if discovery or further investigation reveals that the Class and/or Subclass should be expanded or otherwise modified.

56.     The proposed Class and Subclass meet the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

57. ***Numerosity.*** Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, the Class and Subclass comprises at least hundreds of thousands or millions of consumers throughout the United States and California, respectively. The precise number of Class and Subclass members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class and Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

58. ***Commonality and Predominance***. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class and Subclass members. Common legal and factual questions include, but are not limited to: (a) whether, during the class period, Equifax disclosed, or adequately disclosed, the Glitch to lenders or consumers; (b) whether Equifax used reasonable procedures to ensure that the information included on consumer credit reports was accurate; (c) whether Equifax's measures to ensure accurate consumer reports, violate the FTC Act or the FCRA; (d) whether Equifax's conduct violates the FCRA; (e) whether Equifax acted willfully or negligently when allowing the Glitch to continue without remedy; (f) whether Equifax has been unjustly enriched by its conduct; (g) whether Defendant's conduct alleged herein violated California's Unfair Competition Law ("UCL"),

Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to members of the

California Subclass; (h) whether Plaintiff and the Class and Subclass are entitled to

damages and/or restitution; (i) whether Defendant should be enjoined from further

engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class

and Subclass are entitled to attorneys' fees and costs.

59.    ***Typicality.***  The claims of Plaintiff are typical of the claims of the

Class and Subclass in that Plaintiff and the Class and Subclass sustained damages

as a result of Defendant's uniform wrongful conduct in violation of law, as

complained of herein.

60.    ***Adequacy***.  Plaintiff will fairly and adequately protect Class and

Subclass Members' interests.  Plaintiff has no interests antagonistic to Class and

Subclass Members' interests, and Plaintiff has retained counsel that have

considerable experience and success in prosecuting complex class-actions and

consumer-protection cases.

61.    ***Superiority***.  A class action is superior to all other available methods

for the fair and efficient adjudication of this controversy for, *inter alia*, the

following reasons: prosecutions of individual actions are economically impractical

for members of the Class and Subclass; the Class and Subclass are readily

definable; prosecution as a class action avoids repetitious litigation and duplicative

litigation costs, conserves judicial resources, and ensures uniformity of decisions;

and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

62.     Defendant has acted or failed to act on grounds generally applicable to the Class and Subclass, thereby making appropriate final injunctive relief with respect to the Class and Subclass as a whole.

63.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and Subclass and will likely retain the benefits of its wrongdoing.

64.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## CAUSES OF ACTION

### COUNT I
**Willful Violations of the Fair Credit Reporting Act ("FRCA"),**
**15 U.S.C. § 1681, *et seq*.**
**(*On Behalf Of The Nationwide Class*)**

65.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the paragraphs 1 through 64 as though alleged in this Count.

66.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

67.     In enacting the FCRA, Congress made several findings, including that consumer reporting agencies have assumed a vital role in assembling and

evaluating consumer credit information and other consumer information.  15

U.S.C. § 1681(a)(4).

68.    At all relevant times, Equifax was a consumer reporting agency as

defined by the FCRA.  Under 15 U.S.C. §1681a(f), a "consumer reporting agency"

includes any person which, for monetary fees or on a cooperative nonprofit basis,

regularly engages, in whole or in part, in the practice of assembling or evaluating

consumer credit information or other consumer information for the purpose of

furnishing "consumer reports" to third parties, and which uses any means or

facility of interstate commerce for the purpose of preparing or furnishing consumer

reports.

69.    At all relevant times, Equifax had compiled and maintained a

"consumer report" on Plaintiff and Class Members as defined by the FCRA.  15

U.S.C. § 1681a(d)(1).  As defined in 15 U.S.C. § 1681a(d)(1), a "consumer report"

is any written, oral, or other communication of any information by a consumer

reporting agency bearing on a consumer's credit worthiness, credit standing, credit

capacity, character, general reputation, personal characteristics, or mode of living,

which is used, expected to be used, or collected, in whole or in part, for the

purpose of serving as a factor in establishing the consumer's eligibility for (i)

credit or insurance to be used primarily for personal, family, or household

purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15

U.S.C. § 1681b.

70.    As individuals, Plaintiff and Class Members are consumers entitled to

the protections of the FCRA.  15 U.S.C. § 1681a(c).

71.    As a consumer reporting agency, Defendant was (and continues to be)

required to identify, implement, maintain and monitor the proper data security

measures, policies, procedures, protocols, and software and hardware systems to

safeguard, protect and ensure the accuracy of the consumer credit information in

its possession, custody and control, including Plaintiff's and Class Members'

credit reports and credit scores.  *See* 15 U.S.C. 1681(b).

72.    As a consumer reporting agency, Defendant's actions or inactions that

allowed for the Glitch violate its duties and obligations as a credit reporting agency

under the FCRA.

73.    Defendant's actions or inactions that allowed for inaccurate credit

entries and/or credit scores to be included on consumer reports also violate its

duties and obligations as a credit reporting agency under the FCRA.

74.    As alleged herein, Defendant has engaged in a number of practices

that, taken together, failed to use reasonable measures to provide for the maximum

possible accuracy on consumer credit reports.  Among other things, Defendant

failed to:

(a)     Develop and disseminate comprehensive information integrity policies, including those related to information verification related to the consumer reports and credit scores of Plaintiff and Class Members;

(b)     Assess the risks of using code that could and would lead to inaccurate credit scores and/or consumer reports being sent to lenders; and

(c)     Take appropriate action to correct existing vulnerabilities or threats to personal information in light of known risks, especially those that lead to the Glitch.

75.     The lack of such reasonable data integrity and security measures directly caused damages to Plaintiff and Class Members, as detailed herein.

76.     By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendant willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.*, by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their consumer data and personally identifiable information.

77.    Defendant has violated 15 U.S.C.A. § 1681e(b) because, due to the Glitch, Defendant failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

78.    Defendant repeatedly created inaccurate consumer reports as a result of the Glitch, Plaintiff and Class Members would not have suffered the harm as detailed herein.

79.    Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendant relied on its these procedures, which were unreasonable, and thus Defendant had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

80.    As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports.  In each instance, Equifax was in violation of, Section 1681e of the FCRA.

81.    Equifax's willful failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of § 1681e(b).

82. Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class members for failing to comply with the requirements that a consumer reporting agency not disclose consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports. Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial.

83. In addition, Defendant's failure to comply with the foregoing requirements was willful because Defendant knew or should have known, but recklessly disregarded, that its information verification measures were inadequate and unreasonable and additional steps were necessary to protect Plaintiff and Class Members from the Glitch.

84. Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A). Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

85. Plaintiff and Class Members also are entitled to recover punitive damages, under 15 U.S.C. § 1681n(a)(2), and their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681n(a)(3).

## COUNT II
### Negligent Violations of the Fair Credit Reporting Act ("FRCA"), 15 U.S.C. § 1681, *et seq*. (*On Behalf Of The Nationwide Class*)

86.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the paragraphs 1 through 64 as though alleged in this Count.

87.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

88.     By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendant willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq*., by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their consumer data and personally identifiable information.

89.     Defendant has violated 15 U.S.C.A. § 1681e(b) because, due to the Glitch, Defendant failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

90.     Defendant repeatedly created inaccurate consumer reports as a result of the Glitch, Plaintiff and Class Members would not have suffered the harm as detailed herein.

91.     Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendant relied on its these procedures, which were unreasonable, and thus Defendant had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

92.     As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports.  In each instance, Equifax was in violation of, Section 1681e of the FCRA.

93.     Equifax's failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of § 1681e(b).

94.     Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class members for failing to comply with the requirements that a consumer reporting agency not disclose consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports.  Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial.

95.     Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

96.     Plaintiff and Class Members also are entitled to recover damages and their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681n(a)(3).

## COUNT III
### Violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* (*On Behalf Of The California Subclass*)

97.     Plaintiff re-alleges and incorporates by reference every allegation set forth in paragraphs 1 through 64 as though alleged in this Count.

98.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

99.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

100.   At all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the FRCA, 15 U.S.C. § 1681, *et seq.*, as alleged in Counts I–II above.  Each instance in which Equifax has failed to comply with the FCRA constitutes a separate violation of the UCL.

101.   Defendant's unlawful acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

102.   Plaintiff and the members of the California Subclass have suffered a substantial injury in fact and lost money and/or property by virtue of Defendant's unlawful acts of unfair competition, which caused their loan applications to be denied or caused them to incur a higher interest rate as a result of Defendant's provision of inaccurate credit scores.  Had Defendant complied with its duties and obligations under the FRCA (and thus the UCL), the loan applications submitted by Plaintiff and members of the Subclass would not have been denied or would have been approved at a lower interest rate.  Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

103.   The unlawful actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to restitution and other equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Schwartz, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.   For an order certifying the Class and naming Plaintiff as a representative of the Nationwide Class and California Subclass and naming Plaintiff's attorneys as Class Counsel to represent the proposed Class and Subclass;

b.   For an order declaring that Defendant's conduct violates the statutes and common laws referenced herein;

c.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.   For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For injunctive relief as pleaded or as the Court may deem proper; and

h.   For an award of reasonable attorneys' fees, costs, and litigation expenses pursuant to 15 U.S.C. § 1681n(a)(3), O.C.G.A. §13-6-11, and as otherwise allowed by law;

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: August 15, 2022   Respectfully submitted,

**THE FINLEY FIRM, P.C.**

By: */s/ MaryBeth V. Gibson*
   MaryBeth V. Gibson

MaryBeth V. Gibson
Georgia Bar No. 725843
N. Nickolas Jackson
Georgia Bar No. 841433
3535 Piedmont Road
Building 14, Suite 230
Atlanta, GA 30305
Telephone: (404) 320-9979
Fax: (404) 320-9978
mgibson@thefinleyfirm.com
njackson@thefinleyfirm.com


**BURSOR & FISHER, P.A.**
L. Timothy Fisher *
Joel D. Smith *
Neal J. Deckant *
Julia K. Venditti *
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
ltfisher@bursor.com
jsmith@bursor.com
ndeckant@bursor.com
 jvenditti@bursor.com
*\* Pro hac vice forthcoming*

*Attorneys for Plaintiff*

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: August 15, 2022.

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson